AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

```
                      F I L E D
                      MAY - 3 2018
           CLERK, U.S. DISTRICT COURT
                  RICHMOND, VA
```

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No. 3:18SW090
)
Ailment Wellness  Medical Center, 2216 Princess Anne )
Street, Suite 102, Fredericksburg, Virginia 22401 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Ailment Wellness  Medical Center, 2216 Princess Anne Street, Suite 102, Fredericksburg, Virginia 22401

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
Evidence of a crime, contraband and property designed for use and intended for use in the commission of a crime

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | knowing, intentional and unlawful distribution and dispensation of controlled substances |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ashley Symons, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: May 3, 2018

City and state: Richmond, Virginia

/S/
_____
David J. Novak
United States Magistrate Judge
*Printed name and title*

### AFFIDAVIT OF SPECIAL AGENT ASHLEY SYMONS

I, Ashley Symons, being duly sworn, depose and state as follows:

1.      I am a Special Agent ("SA") of the United States Drug Enforcement Administration

("DEA") and am an investigative or law enforcement officer of the United States within the

meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct

investigations of, and make arrests for the narcotics offenses enumerated in Title 18, United

States Code Section 2516.

2.      I have been employed by the DEA since August 20, 2005.  Currently, I am assigned to

the Richmond/Norfolk Tactical Diversion Squad, in Norfolk, Virginia.  I have received sixteen

weeks of specialized narcotics law enforcement training at the United States Drug Enforcement

Administration Academy, located in Quantico, Virginia.  During my employment with DEA, I

have participated in the surveillance and arrest of numerous drug traffickers.  I have debriefed

numerous persons arrested for controlled substance violations and have debriefed and directed

confidential informants in gathering controlled substance intelligence.  Also, I have spoken with

experienced narcotics investigators concerning the methods and practices of narcotic traffickers.

Through my experience and training and my conversations with other senior investigators, I have

become familiar with the manner in which controlled substances are imported, manufactured,

distributed, sold, and diverted.  I have become familiar with the efforts of persons engaged in the

importation, smuggling, manufacturing, distribution, and sales of controlled substances to avoid

detection and apprehension by law enforcement officers.  I am also familiar with the manner in

which narcotics traffickers use telephone, cellular telephone technology, pagers, coded

communications, false or fictitious identities, and other means to facilitate their illegal activities

and thwart law enforcement investigations.

3.      While with DEA, I have participated in numerous investigations into the unlawful

importation, possession with intent to distribute, and distribution of controlled substances, as

well as the related laundering of monetary instruments, the conducting of monetary transactions

involving the proceeds of specified unlawful activities and conspiracies associated with criminal

narcotics offenses.  In conducting these investigations, I have utilized a variety of investigative

techniques and resources, including physical and electronic surveillance and various types of

informants and cooperating sources.  Through these investigations, my training and experience,

and conversations with other agents and law enforcement personnel, I have become familiar with

the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute

narcotics, and to collect and launder related narcotics proceeds.  I am familiar with methods

employed by narcotics trafficking organizations, and the sophisticated tactics they routinely use

to attempt to thwart investigation of their narcotics organizations.  My knowledge of these

tactics, which includes the utilization of debit calling cards, public telephones, cellular telephone

technology, beepers, counter surveillance, elaborately planned smuggling schemes tied to

legitimate businesses, false or fictitious identities, and coded communications and conversations,

has been particularly useful and relevant to this particular investigation.

4.      This affidavit is submitted in support of a search warrant to search a medical office at

the Ailment Wellness Medical Center, 2216 Princess Anne Street, Suite 102, Fredericksburg,

Virginia, 22401, and a medical office at the Pain Center, 2004 Bremo Road, Suite 200,

Richmond, Virginia, 23226. This affidavit is based upon information I have gained from

my investigation, my training and experience, and information from other law

enforcement officers. Since this affidavit is being submitted for the limited purpose of

securing a search warrant, I have not included each and every fact known to me

2

concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to search Wellness Medical Center, 2216 Princess Anne Street, Suite 102, Fredericksburg, Virginia, 22401 ("Target Location #1) and Pain Center, 2004 Bremo Road, Suite 200, Richmond, Virginia, 23226 ("Target Location #2).

## RELEVANT STATUTES AND LEGAL FRAMEWORK

### I.    Statutory and Regulatory Framework

5.    21 U.S.C. § 841(a)(1) prohibits, *inter alia,* the unauthorized knowing and intentional distribution or dispensation of a controlled substance.

6.    21 U.S.C. § 821 authorizes the Attorney General to promulgate rules and regulations relating to the dispensation of controlled substances.

7.    Individuals and entities that handle or prescribe controlled substances are regulated by DEA under the provisions of the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-971. Every person who manufactures, distributes, or dispenses controlled substances may do so only if such person obtains a DEA registration. 21 U.S.C. § 822(a).

8.    DEA may register a practitioner to dispense controlled substances only if such practitioner is "authorized to dispense. . . controlled substances under the laws of the State in which he practices." 21 U.S.C. § 823(f). A "practitioner" is defined as "a physician . . . licensed, registered or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research." 21 U.S.C. § 802(21).

3

9.      21 U.S.C. § 802(10) provides that the term "dispense" means the delivery of a controlled substance to an ultimate user, and includes prescribing as well as administering controlled substances to that ultimate user.

10.     21 U.S.C. § 802(27) provides that the term "ultimate user" means a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household or for an animal owned by him or by a member of his household.

11.     21 C.F.R. §1306.04 governs the issuance of prescriptions. It provides, in pertinent part, "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." And that, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

12.     21 C.F.R. §1317.30 governs the authorization to collect controlled substances from ultimate users. It provides, in part, that DEA must authorize an entity to collect controlled substances from an ultimate user.

13.     21 C.F.R. §1317.40 governs who may be authorized to collect controlled substances from ultimate users. It provides, in part, that practitioners are not authorized to collect controlled substances from ultimate users.

**II. Virginia Board of Registration in Medicine**

14.     Dr. Zeljko STJEPANOVIC is a licensed medical doctor in the Commonwealth of Virginia, with Virginia State License number 0101251045. Similar to federal guidance, Virginia law provides that for a prescription to be valid, it must be issued for a legitimate medical purpose, by a practitioner in the usual course of his or her professional practice.

4

15.     Title 54. Professional and Occupations, Chapter 33. Pharmacy, § 54.1-3303 Prescriptions

to be issued and drugs to be dispensed for medical or therapeutic purposes only. Further, The

Virginia Board of Registration in Medicine provides:

*A bona fide practitioner-patient-pharmacist relationship is one in which a practitioner*

*prescribes, and a pharmacist dispenses, controlled substances in good faith to his patient for a*

*medicinal or therapeutic purpose within the course of his professional practice. In addition, a*

*bona fide practitioner-patient relationship means that the practitioner shall (i) ensure that a*

*medical or drug history is obtained; (ii) provide information to the patient about the benefits and*

*risks of the drug being prescribed; (iii) perform or have performed an appropriate examination*

*of the patient, either physically or by the use of instrumentation and diagnostic equipment*

*through which images and medical records may be transmitted electronically; except for medical*

*emergencies, the examination of the patient shall have been performed by the practitioner*

*himself, within the group in which he practices, or by a consulting practitioner prior to issuing a*

*prescription; and (iv) initiate additional interventions and follow-up care, if necessary,*

*especially if a prescribed drug may have serious side effects. A practitioner who performs or has*

*performed an appropriate examination of the patient required pursuant to clause (iii), either*

*physically or by the use of instrumentation and diagnostic equipment through which images and*

*medical records may be transmitted electronically, for the purpose of establishing a bona fide*

*practitioner-patient relationship, may prescribe Schedule II through VI controlled substances to*

*the patient, provided that the prescribing of such Schedule II through V controlled substance is*

*in compliance with federal requirements for the practice of telemedicine.*

16.     Virginia Administrative Code, Title 18 Professional and Occupational Licensing Agency 85. Board of Medicine Chapter 20. Regulations Governing the Practice of Medicine, Osteopatic Medicine, Podiatry, and Chiropractic.   18VAC85-20-26. Patient Records.

*Physicians in Virginia shall properly manage patient records and shall maintain timely, accurate, legible and complete patient records. Practitioners shall maintain a patient record for a minimum of six years following the last patient encounter with the following; records of a minor child, including immunizations, shall be maintained until the child reaches the age of 18 or becomes emancipate, with a minimum time for record retention of six years from the last patient encounter regardless of the age of the child; records that have previously been transferred to another practitioner or health care provider or provided to the patient of his personal representative; or records that are required by contractual obligation of federal law to be maintained for a longer period of time.*

**III.     DEA Registration**

17.     According to DEA, Dr. STJEPANOVIC is registered with DEA registration number FS3042885 with privileges, including dispensing and prescribing, for controlled substances in Schedules II through V.  Dr. STJEPANOVIC is not authorized to collect controlled substances from an ultimate user.  In 2014, Dr. STJEPANOVIC provided his registered address as 2300 Charles Street, Suite 102, Fredericksburg, Virginia.  However, on November 14, 2016, he changed it to Target Location #1 and on February 28, 2018, he changed it to Target Location #2.

**PROBABLE CAUSE**

**I.     Fredericksburg Police Department (FPD) Investigation**

18.     On December 9, 2014, a Fredericksburg Police Department ("FPD") officer responded to a pharmacy in Fredericksburg, Virginia ("Pharmacy #1"), in regards to possible criminal activity.

6

Upon arrival, the officer spoke with the pharmacist, who had called law enforcement to express concerns of possible over-prescribing by Dr. Zeljko STJEPANOVIC ("STJEPANOVIC"), whose office was located at 2300 Charles Street, Suite 102, Fredericksburg, Virginia. The pharmacist had recently seen several patients drop off prescription requests for pain pills prescribed by STJEPANOVIC. The pharmacist wanted to make law enforcement aware that patients may be doctor-shopping or going to STJEPANOVIC to get prescriptions written for pain pills. The pharmacist also overheard one customer state that it cost $300 cash for an office visit with STJEPANOVIC.  The pharmacist then presented the officer with a prescription written on December 9, 2014, for 90 pills of oxycodone 30mg Immediate Release (IR) for a 30 day supply. The prescription had STJEPANOVIC's office letterhead on it; however, it was not signed by the doctor.

19.     On December 29, 2014, FPD was informed by a  confidential source ("CS") that the pain clinic on Charles Street was "dirty," providing people with whatever prescription they want as long as they pay $300-$500 in cash per visit.

20.     On January 7, 2015, the CS informed FPD that his/her first visit to the pain clinic cost $600 cash or credit and every visit thereafter was $200.  The clinic did not accept insurance even if the patient had it. The CS stated that there was no examination performed.  While a urine screen was completed, it was not sent off anywhere.  Further, there was some type of contract stating that the patient/s would only take medication prescribed from this clinic and from nowhere else.

21.     In February 2015, staff at another retail pharmacy in Fredericksburg, Virginia ("Pharmacy #2"), started noticing suspicious activity regarding people filing prescriptions from

7

STJEPANOVIC. FPD stationed uniformed patrol units at Pharmacy #2 to monitor the store and

parking lot due to the number of complaints regarding individuals dealing and using pills.

22.     Between February and April 2015, FPD conducted approximately six trash searches at

Ailment Wellness Medical Center, 2300 Charles Street, Fredericksburg, Virginia, 22401. Those

searches yielded several discarded prescriptions and several office schedules with patients'

names and dates of birth; discarded patient EKG records; a document that listed a patient's name

and the amount of money that was paid in cash for the first visit with STJEPANOVIC; patients'

medical insurance information, including their dates of birth and their member ID numbers;

patient Prescription Monitoring Program ("PMP") reports; and documents indicating the medical

procedures that the doctor had performed on or had ordered for the patient that were to be sent to

the patients' insurance companies.

23.     On July 14, 2015, FPD received a telephone call reporting that the caller's daughter had

been seen by STJEPANOVIC three times.  During those interactions, the daughter, who is

legally blind according to her mother, told her mother that STJEPANOVIC kissed her on the

forehead, attempted to make out with her and then fondled her breasts.

24.     On July 24, 2015, the FPD conducted an operation based upon the information they

received on July 14, 2015. A female patient ("Patient #1"), who decided to cooperate with law

enforcement, contacted STJEPANOVIC to see if he would come to a hotel and write her a

prescription. FPD observed STJEPANOVIC arrive at the hotel parking lot. STJEPANOVIC

requested  Patient #1 come to his car, but at that point the FPD intervened and approached

STJEPANOVIC in the parking lot. FPD officers located a blank prescription inside

STJEPANOVIC's wallet; however, STJEPANOVIC stated that he did not recall putting the

blank prescription in his wallet and has never written a prescription outside of the

office. STJEPANOVIC agreed to speak with investigators and admitted to being close with patients, describing himself as a "huggy bear."

25.     On May 19, 2016, the CS informed FPD that several female patients were complaining about STJEPANOVIC sexually assaulting them during their appointments, but that they do not want to come forward because they do not want to lose their doctor.

26.     On June 16, 2016, the CS informed FPD that the office location for STJEPANOVIC would be moving within the next month to Target Location #1.

**II.     Witness Interviews**

**a.     Cooperating Witness**

27.     On June 21, 2017, a cooperating witness ("CW") informed DEA investigators that he/she has been a patient of STJEPANOVIC at the Ailment Wellness Center in Fredericksburg since approximately May 2016. The CW explained that he/she had two friends who referred the CW to the Ailment Wellness Center and that it was easy to get pills from the doctors at that office. The CW explained that when he/she first called the office to schedule an appointment with STJEPANOVIC, the CW was told by the receptionist that the first appointment would be a $600 charge and that the CW would need to bring his/her medical records.

28.     During the first appointment, the CW stated he/she did not bring his/her previous medical records, but STJEPANOVIC decided to see the CW without them. The CW told investigators that during the first appointment he/she submitted a urine specimen to the nurse working at the clinic. After the urine test, the CW went to an exam room where the nurse took his/her blood pressure and checked his/her weight. The nurse then asked the CW why he/she was at the appointment.  The CW stated that he/she had been diagnosed with spinal issues and was having pain in his/her neck. The CW informed investigators that he/she did not fill out a patient

9

questionnaire at the time of his/her first appointment. STJEPANOVIC asked the CW what issues

he/she was having and the CW informed STJEPANOVIC that he/she was having pain in his/her

neck. The CW informed investigators that at the first visit STJEPANOVIC did not conduct a full

medical exam, did not ask to see the range of motion, did not ask the CW to move his/her neck,

and did not ask the CW to squeeze the doctor's fingers. STJEPANOVIC also did not ask the CW

if there were any pre-existing conditions or if the CW had any allergies. The CW stated that both

STJEPANOVIC and the nurse wrote down something in a paper file during this visit.

STJEPANOVIC then prescribed the CW a 20-mg oxycodone pill, four times per day for the pain

in his/her neck. The CW advised the first appointment lasted approximately 15 to 20 minutes.

29.     The CW informed investigators that subsequent appointments with STJEPANOVIC

became uncomfortable. The CW said STJEPANOVIC gave him/her an inappropriate hug, which

he/she described as being extremely close, long in duration, with STJEPANOVIC's hands placed

at the CW's lower back and upper buttock area. STJEPANOVIC told the CW that he liked how

the CW's body looked and the he/she needed to be naked in the sun more often since his/her

Vitamin D appeared to be low. The CW advised that on numerous appointments STJEPANOVIC

talked about various personal issues with the CW, such as being lonely and needing to spend

time with someone since he was getting divorced. More recently, during an appointment in June

2017, STJEPANOVIC stated that he married a female from another country so she could obtain

a visa. STJEPANOVIC also advised that his new wife was pregnant. The CW felt that if he/she

did not accept the doctor's hugs and comments that the CW would not be able to obtain any

prescriptions from STJEPANOVIC.

30.     The CW advised that his/her appointments with STJEPANOVIC lasted approximately

10 minutes.  The doctor would ask the CW if the medication was working and if there were any

new pains. The CW advised that STJEPANOVIC would make small talk with the CW, discussing personal issues. The CW stated he/she has never signed a patient contract at the Ailment Wellness Center. . The CW stated that there have been numerous appointments where he/she has not submitted a urine sample. On one occasion the Ailment Wellness Center did not have any collection cups so the nurse told the CW that he/she would not be doing a urinalysis test. Nonetheless, the nurse told the CW that the nurse had to put something in the file to document the test.

31.     The CW advised that during his/her appointments at the Ailment Wellness Center between January and May 2017 STJEPANOVIC explained that because of DEA STJEPANOVIC needs to keep his patients medications/prescriptions under a certain limit. The CW stated he/she was receiving a prescription for four 20 mg oxycodone pills per day, but the doctor advised that he had to switch the CW to three per day, which STJEPANOVIC did due to his concern with the DEA.

32.     During the CW's most recent appointment in June 2017, STJEPANOVIC gave the CW the usual uncomfortable hug and asked how things were going. The CW advised STJEPANOVIC that he/she was not sleeping well and the CW's shoulder was hurting. STJEPANOVIC recommended a homeopathic remedy that he had seen on the internet to try to help the CW sleep better. The CW advised he/she spent about five minutes with the doctor. The CW said STJEPANOVIC wrote some notes in his/her file. After seeing the doctor, the CW waited to receive his/her prescription for oxycodone pills from the nurse.

     **b.     Patient #2**

33.     On August 14, 2017, members of the DEA Richmond District Office and FPD interviewed a former female patient ("Patient #2") of STJEPANOVIC's regarding his medical

11

practices. Patient #2 stated she had been a patient of STJEPANOVICs' for approximately one and one half years and last attended an appointment with STJEPANOVIC in March or April of 2017. She said she has not been to the office recently for an appointment, but was told by the office that she would be welcomed back as a patient. The Patient #2 stated she found STJEPANOVIC in the phone book because she was looking for a doctor to help manage stomach and back pain.

34.     Patient #2 stated that prior to her first appointment she took copies of her medical records to the Ailment Wellness Medical Center. During her first appointment, Patient #2 stated she initially met with a nurse, who took her vital signs, and submitted a urine sample for analysis. Patient #2 stated she did not believe she filled out a patient questionnaire during her first visit or at any subsequent visits with STJEPANOVIC.

35.     After seeing the nurse, Patient #2 saw STJEPANOVIC. Patient #2 stated STJEPANOVIC did not really conduct an examination at her first appointment; did not ask her if she was allergic to any medications; did not check her back, ask her to touch her toes, or check her range of motion; and he did not conduct any X-rays of her injuries. Patient #2 stated that only an EKG test was conducted at her first appointment. Patient #2 stated she provided STJEPANOVIC with an X-ray she had from a previous doctor and STJEPANOVIC utilized her previous doctor's orders to prescribe her medication for Dilaudid 8mg (3 to 4 pills per day) and Morphine Sulfate 60mg (2 extended release pills per day).

36.     Patient #2 stated that during one of her monthly appointments STJEPANOVIC told her that he had to reduce the quantity of pills she was receiving due to regulations. Patient #2 stated she did not meet with STJEPANOVIC for a long duration of time and that she usually was seen by him for approximately five minutes during her appointments. In addition, Patient #2

stated STJEPANOVIC never recommended therapy, stretching or ice to help with her pain and did not review her previous medical records with her.

37.     Patient #2 stated she would pay $250 per monthly visit and usually paid cash for the appointment. The receptionist would be the one who would receive and process the payments.

38.     Patient #2 said she knows of two occasions when she did not submit a urine sample during her scheduled appointment. During one occasion, she was advised that the office did not have any specimen cups so she could not submit a urine sample, but that the nurse said that she would have to note something in Patient #2's medical file regarding it.

39.     Patient #2 stated that she would usually see the same people in the office during her appointments and that none of the employees at the Ailment Wellness Medical Center ever suggested a particular pharmacy where she should fill her prescriptions. She stated on one occasion that the pharmacist from Wegman's in Fredericksburg, Virginia, had to call STJEPANOVIC's office about her prescription, but she was not sure why.

40.     Patient #2 stated the STJEPANOVIC would talk to her about personal things during her appointments, including his pending divorce. Patient #2 stated she thought it was odd that STJEPANOVIC was talking to her about such personal matters.

41.     Investigators asked Patient #2 to describe the difference between her medical appointments with STJEPANOVIC and her previous doctor. She stated that her previous doctor had her fill out a medical questionnaire at her initial visit on which she listed her medical history and allergies. Also her appointments with her previous doctor were much longer and the doctor conducted a more thorough examination. Patient #2 emphasized the significant differences in the practices of her prior doctor and STJEPANOVIC.

III.    **Undercover Visits with Dr. STJEPANOVIC[1]**

      a.    **July 17, 2017 Visit with Dr. STJEPANOVIC at Target Location #1**

42.    On July 17, 2017, the CW, operating under the direction of law enforcement, attended an

appointment with STJEPANOVIC at Target Location #1. When he entered the examination

room, STJEPANOVIC gave the CW the usual uncomfortable hug that he/she had

previously described. The doctor asked how the CW was doing and the CW stated he/she was

doing well. STJEPANOVIC met with the CW for a very short time and did not ask the CW

about his/her pain. The CW asked STJEPANOVIC if he was accepting new patients.

STJEPANOVIC said he was, and gave the CW a business card for Melissa MILES ("MILES"),

explaining she was the person to contact for new patients. The CW advised that STJEPANOVIC

gave him/her the uncomfortable hug before he exited the room. At the end of the visit, the CW

received a prescription (84) 30-mg oxycodone pills.

      b.    **August 14, 2017 Visit with Dr. STJEPANOVIC at Target Location #1**

43.    On August 14, 2017, at approximately 10:20 a.m., while working in an undercover

capacity, DEA Task Force Officer Eileen Davis ("TFO Davis"), accompanied by the CW,

entered Target Location #1, for the CW's scheduled appointment with STJEPANOVIC.

44.    While seated in the waiting room, TFO Davis overheard a conversation between Melissa

MILES, who was at the receptionist desk, and other patients who were in the waiting room. The

patients were discussing trouble they had experienced filling prescriptions written by

---

[1] Unless otherwise noted, all visits detailed herein were audio and/or video recorded and were
surveilled by law enforcement. All monies used during these visits were provided by DEA,
which recorded serial numbers of the bills provided. Additionally, agents searched the CW both
before and after each visit and found no contraband.

STJEPANOVIC. MILES responded by recommending that the patients fill the prescriptions at a new pharmacy ("Pharmacy #3") and provided the name and location. MILES said that the pharmacist was great, treats everyone nicely, and does not question STJEPANOVIC's prescriptions.

45.    After approximately fifteen minutes, MILES came from the back of the office and asked the CW to come up to the counter to check in. TFO Davis observed the CW pay MILES $250.00 U.S. Currency for his/her office visit. As the CW was paying, he/she introduced TFO Davis to MILES as a friend from Pennsylvania, staying at his/her house, who would like to see STJEPANOVIC as well. MILES asked the CW and TFO Davis to have a seat and wait until STJEPANOVIC was ready.

46.    After approximately ten minutes, MILES opened the office door and called the CW back. The CW and TFO Davis both entered through the office door and went to the bathroom. While waiting for the CW to finish providing a urine specimen, MILES asked TFO Davis if she had a Virginia identification. TFO Davis responded she did.

47.    Once the CW finished providing the urine sample, TFO Davis observed the CW place the unlabeled cup containing the urine sample on a counter next to another cup of urine. Neither cup was labeled.[2] MILES told the CW and TFO Davis to walk down to the last examination room. MILES came into the room, took vitals from the CW and asked the CW what his/her level of

---

[2] I know from my training and experience that it is common for physicians treating chronic problems to test their patients' urine to ensure that the patient is taking the prescribed medication and/or to ensure that the patient is not taking any substances, namely controlled substances, that they have not been prescribed or for which they are not being treated. To attribute a sample and related analysis with a particular patient, the original sample should contain markings specific to a patient; however, this does not appear to have occurred with the CW.

pain was. The CW said his/her pain level was a seven out of ten. Moments later, STJEPANOVIC entered the room.

48.     STJEPANOVIC shook the CW's hand and asked who TFO Davis was. The CS advised STJEPANOVIC that TFO Davis was his/her friend who was staying on his/her couch for the time being. The CW and TFO Davis talked to STJEPANOVIC about scheduling an appointment in the future for TFO Davis to see STJEPANOVIC.

49.     The CW stated that he/she was in pain and had run out of his/her prescription early.[3] STJEPANOVIC wrote something into his/her file, but the CS did not know what. STJEPANOVIC then examined the CW's neck. While doing so, STJEPANOVIC asked the CW about the red mark on his/her neck and asked if the CW's spouse had bit him/her. (After this visit, the CW told investigators that he/she has had that mark on his/her neck for a long time and if STJEPANOVIC had properly examined him/her previously, he would have seen it.) At the conclusion of the appointment, Dr. STJEPANOVIC gave the CW a hug and told TFO Davis that it was nice to meet her.

50.     After the appointment, STJEPANOVIC handed MILES a written prescription, which MILES then made a copy of, and handed the original prescription for (84) 30-mg oxycodone pills to the CW.

        **c.     August 31, 2017 Visit with Dr. STJEPANOVIC at Target Location #1**

51.     On August 31, 2017, at approximately 12:30 p.m., TFO Davis, while working in an undercover capacity, entered Target Location #1 for her scheduled appointment to see STJEPANOVIC. MILES told TFO Davis to come back to a room and have a seat to discuss her

---

[3] Finishing the prescription early means using more pills per day than prescribed.

visit.  MILES asked TFO Davis if TFO Davis had an MRI.  TFO Davis told MILES she did not

bring any paperwork with her and advised that she did not believe she had ever had an MRI

taken.  MILES provided TFO Davis with paperwork titled "Ailment Wellness Medical Center

Authorization for Release of Health Information."  TFO Davis advised MILES she was unsure of

the information she needed and who to contact to obtain the information.  MILES said they

normally require an MRI so they can determine where the pain is coming from.  MILES said she

would speak with STJEPANOVIC and explain TFO Davis' situation; however, MILES was

doubtful that STJEPANOVIC would see TFO Davis that day.  MILES explained how TFO

Davis could pick-up her medical history from the hospital and again TFO Davis explained

to MILES that TFO Davis has never been in the hospital and would not know where to bring the

request.  TFO Davis reminded MILES that she was living locally with a friend and TFO

Davis did not know where to go to see a doctor for anything in the local area.

52.      MILES said she had spoken with STJEPANOVIC and offered two choices: TFO

Davis could wait until she obtained a copy of an MRI and then be seen by

STJEPANOVIC or TFO Davis could be seen as a new patient, pay for the office visit

and STJEPANOVIC would write TFO Davis a prescription for an X-ray, which is cheaper than

an MRI.  TFO Davis agreed to be seen by STJEPANOVIC as a new patient and paid MILES

$600 in U.S. Currency.  TFO Davis asked MILES if STJEPANOVIC would be able to write her

a prescription for Adderall.  MILES suggested that TFO Davis needed to speak

to STJEPANOVIC about that.  MILES then asked if TFO Davis had ever had a prescription for

Adderall.  MILES again confirmed with TFO Davis her name and date of birth, then walked to

her computer and appeared to conduct a search.  MILES advised TFO Davis that she observed in

2016 that TFO Davis had received a prescription for Adderall for two days, with a quantity of

17

twelve pills.[4] TFO Davis agreed with MILES and observed MILES print the report and place it in a folder. MILES said she would speak with STJEPANOVIC and would inform TFO Davis what STJEPANOVIC had said. TFO Davis then observed MILES walk another patient back into an exam room.

53.    MILES called TFO Davis to the back of the office, took her weight and advised TFO Davis that she needed to provide a urine sample. TFO Davis advised MILES that she was not able to provide one. MILES advised TFO Davis that she would need to provide a urine sample before the end of her appointment. MILES escorted TFO Davis to the exam room and said she would take TFO Davis' vitals. STJEPANOVIC would then be in momentarily. MILES placed TFO Davis' chart on the counter and stepped out of the room.

54.    Moments later, STJEPANOVIC entered the exam room, shook TFO Davis' hand and sat on a chair that was placed in the corner of the room. STJEPANOVIC asked TFO Davis several questions, to include if TFO Davis had children, was married or divorced, smoked, or had any allergies. He then asked about TFO Davis' overall health. STJEPANOVIC asked TFO Davis when she had felt discomfort in her neck. TFO Davis said it had not occurred for approximately two months. TFO Davis advised Dr. STJEPANOVIC that she had had pain in the past and had always taken Tramadol because it made her feel good.[5] TFO Davis told STJEPANOVIC that the Tramadol is all she had really taken for the pain. STJEPANOVIC asked TFO Davis if she had

---

[4] Based upon my experience and my involvement in this case, I believe that MILES was querying TFO Davis's undercover name in the Virginia Prescription Monitoring Program, which is more fully explained below. I further believe that MILES found a positive record for an individual with the same name as TFO Davis's undercover identity.

[5] Tramadol, a Schedule IV controlled substance, is an opioid analgesic commonly sold by the brand name Ultram.

more pain or less. TFO Davis told STJEPANOVIC "no, it's not bad, and it's not all the time." TFO Davis explained that she had taken tramadol for years and was used to it. STJEPANOVIC then mentioned querying the prescription monitoring program.

55. STJEPANOVIC said he would write TFO Davis a prescription for a scan. While writing the prescription, DR. STJEPANOVIC asked TFO Davis what kind of exercise she was doing to keep in shape. After several minutes of talking, STJEPANOVIC said he was going to write a prescription for tramadol and then left the room.

56. MILES entered the room and said STJEPANOVIC would give TFO Davis a prescription for tramadol. MILES informed TFO Davis that STJEPANOVIC wanted a CT scan instead of an MRI because a CT scan is less expensive. MILES told TFO Davis that STJEPANOVIC really wanted this done by the time TFO Davis returned for her next appointment. MILES told TFO Davis that she needed to provide a urine sample that day to test TFO Davis for controlled substances.

57. MILES also explained that MILES would call patients and demand that they provide a count of the pills the patients had remaining and that once called, patients have 24 hours to respond to the mandatory pill count. MILES stated she would call three times and if TFO Davis did not respond then TFO Davis would be discharged from the program. However, MILES explained that the office had never removed a patient. She added that she was just explaining the rule. TFO Davis then asked MILES if TFO Davis should ask STJEPANOVIC about obtaining a prescription for Adderall. MILES suggested that TFO Davis wait until the next visit. MILES handed TFO Davis a prescription for (84) 50-mg tramadol pills and a prescription for a CT Scan. TFO Davis then told MILES again she was unable to provide a urine sample because she

19

did not have to go to the bathroom.  MILES said she did not have time to wait and would get the

urine sample at the next appointment.  TFO Davis then exited Target Location #1.

### d.    January 19, 2018 Visit with Dr. STJEPANOVIC at Target Location #2

58.    In January 2018, TFO Davis called Target Location #1 to confirm an appointment with

STJEPANOVIC.  TFO Davis spoke with MILES, who informed TFO Davis that

STJEPANOVIC had not been with the practice for at least two months.  TFO Davis asked for a

contact number to call STJEPANOVIC directly.  MILES said neither she nor anyone had contact

information for STJEPANOVIC and she had no way of contacting him.  TFO Davis asked

MILES if STJEPANOVIC was practicing elsewhere.  MILES said that she did not know.  TFO

Davis asked MILES where TFO Davis's medical information was, along with all the other

patients' medical information, if STJEPANOVIC was no longer at the office.  MILES stated,

"STJEPANOVIC left everyone's files at the office, he just walked out and quite frankly, you

didn't have much of anything in your file anyway."

59.    Later that day, investigators were able to locate a new office for STJEPANOVIC at

Target Location #2.  On January 12, 2018, TFO Davis called Target Location #2 and spoke with

a female who identified herself as "Olga."  TFO Davis requested to see STJEPANOVIC for an

appointment.  Olga asked if TFO Davis was from Virginia.  TFO Davis stated she was and had

previously been a patient of STJEPANOVIC.  Olga said the office was only open on Fridays

from 8:00 a.m. to 4:00 p.m. and asked TFO Davis to come in that day (January 12th).  TFO

Davis informed Olga that she could not come in that day, but was available the following Friday.

Olga provided the address as Target Location #2 and TFO Davis said that she would be there the following Friday.[6]

60.     On January 19, 2018, at approximately 11:00 a.m., TFO Davis and DEA Task Force Officer Kimberly Dabbs ("TFO Dabbs"), both working in an undercover capacity, entered Target Location #2 for a scheduled appointment to see STJEPANOVIC.

61.     Upon arriving, TFO Dabbs observed two employees working at the front window inside the waiting area. TFO Dabbs observed a cash box filled with a large amount of U. S. Currency behind the window. The employees requested identification from both TFO Davis and TFO Dabbs, which they provided. The employees also requested that TFO Davis and TFO Dabbs complete a registration form. One of the employees asked TFO Dabbs to provide a urine sample, but TFO Dabbs responded that she did not need to go to the bathroom at that time.

62.     While in the waiting room, TFO Davis and TFO Dabbs began a conversation with an unknown white male ("UWM-1"), who came into the waiting area from a back room. TFO Davis asked UWM-1 how he had met STJEPANOVIC and how long he had been his patient. UWM-1 stated that something happened to his previous doctor, so all the patients were referred to STJEPANOVIC, who took over roughly thirty patients. The UWM-1 further stated he drives five hours one way from West Virginia to see STJEPANOVIC and had been seeing him since September 2017. UWM-1 said he was waiting for his wife, who was still in a back room.

63.     TFO Dabbs partially completed the registration form, but left blank the section asking her to describe her level of pain. TFO Dabbs returned the form to the employees at the front desk.

---

[6] This call was not recorded.

The receptionist told TFO Dabbs the cost of the visit was $250, which TFO Dabbs paid in U.S. currency. She received two receipts in return. Later, a female, who subsequently identified herself as Olga, came and brought TFO Davis and TFO Dabbs to a small office in the back that had two chairs and a desk, where Olga sat. She had a small iPad and a blood pressure monitor. Olga asked TFO Dabbs a few questions and documented the answers on the iPad. She then checked TFO Dabbs' blood pressure. TFO Davis told Olga that TFO Davis was a patient of STJEPANOVIC's at his previous practice in Fredericksburg. Olga left the room and moments later returned with STJEPANOVIC. STJEPANOVIC told TFO Davis that he could not see her that day because she was not a new patient and that he had issues with his prior office in Fredericksburg (Target Location #1), which threatened to sue him if he saw any patients he had seen there.

64. Both TFO Davis and TFO Dabbs were then moved to another room where they were introduced to a white male who identified himself as Wendell. Wendell said he was an ex-cop and was there to screen the patients who were prescribed opioids to make sure they were not abusing or selling the pills. During the interview, Wendell opened his Facebook page on a desktop computer and showed pictures of himself in a police uniform and of his family. Wendell stated he was fired from a police department in Tennessee. He went on to discuss a previous doctor he had worked for who had been arrested on drug charges.

65. Wendell gave TFO Dabbs the rules of the program, including how to dispose of her medication. Wendell specifically told TFO Dabbs, "Never destroy your medication, always bring it back in. Legally only you, the pharmacy and the DEA can destroy Scheduled II narcotics." Wendell pulled up an application on the computer and began asking a series of questions. While

22

doing so, TFO Dabbs observed Wendell filling in answers to questions that she had not answered or provided.

66.    After that, TFO Davis and TFO Dabbs were escorted to another office to see STJEPANOVIC.  This room contained a desk and chairs with no exam table nor any items that would typically be found in a medical exam room.  STJEPANOVIC entered the room and sat behind a desk, across from TFO Davis and TFO Dabbs.  TFO Dabbs told STJEPANOVIC that she was currently using tramadol, Percocet[7], and Adderall.  The conversation then continued:

STJEPANOVIC:    What you want to me to give to you, because you cannot get tramadol and Percocet in the same time.

TFO Dabbs:    Percocet.

STJEPANOVIC:    I give you Oxycodone, okay? Instead for Percocet.

TFO Dabbs:    Okay.

STJEPANOVIC:    Until we see what will happen.

TFO Dabbs:    Okay.

TFO Davis:    Are you gonna to be able to write her a prescription for tramadol, like me?

STJEPANOVIC:    Either or, either…well, I cannot do at the same time. I give her, I will give her double dose of ten (10) milligram right now, and then you can, you know, I cannot say…[8]

67.    STJEPANOVIC wrote TFO Dabbs a prescription for (90) 10-mg oxycodone pills and a prescription for a L-S Spine CT.  As the undercover agents were leaving the office,

---

[7] Percocet is the brand name of a pill containing oxycodone, a Schedule II controlled substance.

[8] Based upon my experience and my involvement in this case, I believe that STJEPANOVIC was implying that he would write TFO Dabbs a prescription for a double dose of oxycodone pills with the intent that they be shared with TFO Davis, since he could not see her that day due to his fear of being sued from his old practice.

STJEPANOVIC gave TFO Davis a tight hug while wrapping his arm on TFO Davis' lower back. STJEPANOVIC advised TFO Dabbs to come back the next time with the scan.

      _____e.      **February 16, 2018 Visit with Dr. STJEPANOVIC at Target Location #2**

68.      On February 16, 2018, at approximately 11:15 a.m., TFO Davis and TFO Dabbs, both working in an undercover capacity, entered Target Location #2 for a scheduled appointment to see STJEPANOVIC.

69.      TFO Dabbs signed in for her appointment. Shortly afterwards, both TFO Davis and TFO Dabbs were escorted by Olga to an office to have their blood pressure taken. While in the room, Olga advised TFO Davis that although TFO Davis did not have an appointment, the doctor had agreed to see her. Olga asked TFO Davis what her level of pain was that day. TFO Davis responded, "Not much today, maybe a two." Olga responded and said, "You have to say something to be covered."[9] Olga asked TFO Davis for her birthdate, weight and height and said she was starting her chart. While seated in Olga's office, at no time was TFO Davis asked where or what kind of pain she was having.

70.      TFO Davis and TFO Dabbs then met with Wendell, who was seated in a back room in front of a computer. Wendell asked TFO Davis a series of questions related to her pain level and previous medication/drug use. TFO Davis answered Wendell's questions, to include admitting to borrowing friends' prescription medications. Wendell appeared to enter all of TFO Davis's responses to his questions into his computer.

---

[9] Based upon my training and experience and my involvement in this case, I believe that Olga was instructing TFO Davis to rate her level of pain high enough to justify a prescription for a controlled substance.

71.    Wendell left the room and moments later came back and advised TFO Davis that STJEPANOVIC was ready to see her. Wendell advised TFO Dabbs to stay seated until STJEPANOVIC was done with TFO Davis.

72.    A few minutes later, TFO Davis met with STJEPANOVIC.  During that meeting, STJEPANOVIC again expressed his reluctance to see TFO Davis for fear of being sued by his former practice.  However, STJEPANOVIC stated, "What I was thinking in the beginning according, that you are so nice, and I know that is illegal, but I technically can write down those medications on [sic] her name."  TFO Davis agreed.  STJEPANOVIC went on to explain that he could see TFO Davis as his own patient in a few months and further stated, "In the first couple months, I will just put everything on her name if that's is okay."[10]

73.    While TFO Davis was with STJEPANOVIC, TFO Dabbs stayed with Wendell, who told TFO Dabbs that he needed to ask her a few questions.  TFO Dabbs asked Wendell if she had to pay him. Wendell advised she did.  He said the cost was $175.  After answering a few questions, TFO Dabbs told Wendell that she had $180. Wendell said "so I owe you five". Wendell provided TFO Dabbs with two receipts.  TFO Dabbs paid Wendell $180 U.S. Currency and Wendell put the cash in a money box that was located in the closet. He never gave TFO Dabbs the five dollars he owed in change. Wendell asked TFO Dabbs if she had taken a drug test her last visit. TFO Dabbs said she had provided a urine sample her last visit, which was not true.  Wendell asked TFO Dabbs if she had her prescription bottles from her last visit.  TFO Dabbs stated she did not have them with her.

---

[10] I believe that STJEPANOVIC was offering to write a prescription for tramadol for TFO Davis in TFO Dabbs's name until he felt comfortable he would not get sued by his previous practice for seeing TFO Davis.

74.     Wendell then walked TFO Dabbs to STJEPANOVIC's office, where TFO Davis and STJEPANOVIC were located. STJEPANOVIC stated, "Your friend cannot get it on me. We did talk about to put her Tramadol on your name as well. Is that okay?" TFO Dabbs responded that it was.  STJEPANOVIC further stated, "Is that okay? I'm sorry, is [sic] illegal, but you know…" STJEPANOVIC then wrote TFO Dabbs two prescriptions, one for (90) 10-mg oxycodone pills and the other for (90) 50-mg tramadol pills.  TFO Davis and TFO Dabbs then exited Target Location #2.

> f.     **March 15, 2018 Visit with Dr. STJEPANOVIC at Target Location #2**

75.     On March 15, 2018, at approximately 11:15 a.m., TFO Dabbs, working in an undercover capacity, entered Target Location #2 for a scheduled appointment to see STJEPANOVIC. An unknown white male ("UWM-2") entered the waiting area and went behind the receptionist desk. UWM-2 asked TFO Dabbs if it was her first time visiting the doctor. TFO Dabbs stated that she had seen the doctor before. UWM-2 then asked TFO Dabbs identifying information, such as her name and address. He asked if TFO Dabbs was seeing the doctor for pain management. She said she was. UWM-2 informed TFO Dabbs that the visit would cost $150. TFO Dabbs then paid $150 in U.S. Currency. UWM-2 escorted TFO Dabbs to a small room.

76.     Moments later STJEPANOVIC entered the room, greeted TFO Dabbs and instructed her to follow him to his office. Once there, STJEPANOVIC sat down behind his desk at the computer. While looking at his screen, STJEPANOVIC told TFO Dabbs, "I see you have a higher pain level 4." TFO Dabbs said "yeah," but had not reported any pain levels to anyone that day, including STJEPANOVIC. STJEPANOVIC said, "It was 2 or 3 before," and asked why. TFO Dabbs stated she did not know, but that she has good and bad days.

26

77.     STJEPANOVIC stated, "I need a report here from you, pain lower back, shooting pain

in left leg?" TFO Dabbs agreed. STJEPANOVIC stated he would discharge TFO Dabbs if she

did not bring the scan to her next visit. STJEPANOVIC told TFO Dabbs that he could not keep

seeing her for months without having it and that if the DEA came now they would look for it.

STJEPANOVIC stated, "I could scan it to your file then we are ok. She is really sick lady, let's

help her."

78.     While writing on a prescription pad, STJEPANOVIC asked TFO Dabbs how she was

sleeping. TFO Dabbs stated better. TFO Dabbs and STJEPANOVIC had small talk about the

doctor vacationing with his family. STJEPANOVIC asked TFO Dabbs if she wanted him to do

the same as last time, "You need for girl or not?"[11] TFO Dabbs said, "Yeah she asked me to get

it." STJEPANOVIC continued to write the prescriptions and remarked, "Stay quiet, do your

stuff, don't change, that's why you don't change pharmacies so they don't recheck every time."

79.     STJEPANOVIC finished writing the prescriptions. He got up from the desk and walked

towards TFO Dabbs. STJEPANOVIC engaged TFO Dabbs with a front hug wrapping both arms

around TFO Dabbs' lower back, caressing the upper area of TFO Dabbs' buttocks.

STJEPANOVIC escorted TFO Dabbs from his office towards the receptionist desk. While

walking down the hall he kept his arm wrapped around TFO Dabbs' waist line. As

STJEPANOVIC and TFO Dabbs approached the front desk area, he released his hold and

walked behind the counter where the UWM-2 was sitting. STJEPANOVIC gave TFO Dabbs the

---

[11] I believe that STJEPANOVIC was asking if TFO Dabbs wanted a prescription for tramadol for
TFO Davis, who was not present.

two prescriptions, one for (90) 50-mg tramadol pills and one (90) 10-mg oxycodone pills. TFO

Dabbs then exited Target Location #2.

## VI.    Prescription Monitoring Program Analysis

80.    The Virginia Department of Health Professions maintains a prescription monitoring

program ("PMP") that collects prescription data for controlled substances in Schedules II

through IV.  Pharmacists and other entities authorized to sell controlled substances are required

to report all dispensing of controlled substances in Schedules II through IV to the PMP.  The

primary purpose of the PMP is to promote safe prescribing and dispensing practices for covered

substances by providing timely and essential information to healthcare providers. Law

enforcement and health profession licensing boards use the PMP to support investigations related

to doctor shopping, diversion, and inappropriate prescribing and dispensing.

81.    The PMP documents to whom the prescription was written, but not who actually obtained

or paid for the filled prescription.  That information may be obtained from the pharmacy where

the prescription was filled.

82.    Much like Virginia, West Virginia also maintains its own PMP; however, only for

substances in schedules II, III, and IV.

83.    An analysis of the PMP for Virginia and West Virginia for prescriptions written and

authorized by STJEPANOVIC revealed that prescriptions for controlled substances, including

oxycodone, hydromorphone, oxymorphone, hydrocodone, and fentanyl, were filled by over

1,435 individual patients.  Further analysis revealed that some patients resided in excess of 200

miles from either Target Location #1 and Target Location #2, including Bristol, TN; Greenville,

TN; Ranger, WV; Kenova, WV; Fishkill, NY; Akron, OH; and Corbin, KY.

28

### V.  Consultant's Evaluation of Controlled Substance Prescribing by STJEPANOVIC

84.     Investigators have consulted with Dr. Gene S. Kennedy, M.D., a licensed Medical Doctor in the State of Georgia.  Investigators provided Dr. Kennedy with the audio/video recordings and/or transcriptions of the undercover operations, as well as copies of the prescriptions obtained by the CW and the undercover officers, as detailed above, and asked him to provide a written opinion whether the prescriptions provided by STJEPANOVIC to the CW, TFO Davis, and TFO Dabbs were valid.

85.     After reviewing the supplied information, Dr. Kennedy provided the following opinions:

**a.     Regarding the Prescriptions from July 17, 2017, August 14, 2017, and August 31, 2017:**

*"In summary, the reviewed audio and video files alone do not adequately support the prescribing scheduled medications. Of course, it will be necessary to review the complete patient charts to provide a <u>definitive statement</u> about whether the prescriptions were medically legitimate and within the course of normal medical practice." (Emphasis in Original).*

**b.     Regarding the Prescriptions from January 19, 2018, and February 16, 2018:**

*"The physician <u>unambiguously</u> provided prescriptions to UC1 and UC 2 that were outside the course of usual medical practice and not for legitimate medical purpose. Further, he proposed a plan to <u>continue</u> providing them in the future. Review of the UC 2 medical chart would confirm the extent to which it has been falsified."[12] (Emphasis in Original).*

---

[12] In this review, "UC1" refers to TFO Davis and "UC2" refers to TFO Dabbs.

c.     **Regarding the Prescriptions from March 16, 2018:**

*"The physician again provided prescriptions to UCl and UC2 that were outside the course of usual medical practice and were not for a legitimate medical purpose. He advised UC2 about maintaining a low profile to avoid detection of illicit prescriptions. Again, review of the UC2 medical chart would confirm the extent to which the associated documentation has been falsified."*

## VI.     Medical Records Generally

86.     I know that medical practitioners keep medical records of patients in their medical offices. In the normal course of business, physicians maintain patient records and files in the offices in which treatment, care, or business is conducted. These medical records often contain evidence of a lack of a legitimate medical purpose for the types of controlled substances prescribed. They also frequently keep written and automated records, books, ledgers, and logs, among other things, related to their medical practice and prescription writing activities at their offices and places of business.  As a result of this specific investigation, I believe that medical records may be found in both hard and electronic format at both Target Location #1 and Target Location #2.

87.     Based on the foregoing, I do not believe that all of the prescriptions from STJEPANOVIC that I have uncovered during my investigation were written for a legitimate medical purpose, in violation of 21 USC § 841(a) (1).  Furthermore, I believe that the medical records kept inside the Target Premises contain evidence of that crime.

## SEARCHING AND SEIZING COMPUTER EVIDENCE

88.     From my training, experience, and information provided to me by other agents, I am aware that businesses frequently use computers to carry out, communicate about, and store

records about their business operations. These tasks are frequently accomplished through sending and receiving business-related email and instant messages; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money online.

89.     From my training, experience, and information provided to me by other agents, I am aware that businesses commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

Computer hardware, other digital devices, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of a crime: and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data.

90.     In this case, the search warrant application requests permission to search for and seize records, including those items that may be stored on a computer, digital device or on electronic media. Such records constitute evidence of a crime.

91.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

31

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file systems data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache".  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      In addition, based on my knowledge, training, and experience, I know that businesses and business people often retain correspondence, financial, transactional, and other

business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business related purposes.

92.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.      The volume of evidence – storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements - analyzing computer hardware, computer software, or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best

33

analyze the system and to protect the integrity of the evidence and to recover even "hidden",

deleted, compressed, or encrypted files. Many commercial computer software programs also

save data in unique formats that are not conducive to standard data searches. Additionally,

computer evidence is extremely vulnerable to tampering or destruction, both from external

sources and destructive code imbedded in the system as a "booby trap."

93.     Consequently, law enforcement agents may either copy the data at the premises to be

searched or seize the computer equipment for subsequent processing elsewhere.

94.     The premises may contain computer equipment whose use in the crime(s) or storage of

the things described in this warrant is impractical to determine at the scene. Computer

equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In

addition, technical, time, safety, or other constraints can prevent definitive determination of their

ownership at the premises during the execution of this warrant. If the things described in

Attachment B are of the type that might be found on any of the computer equipment, this

application seeks permission to search and seize it onsite or off-site to determine their true use or

contents, regardless of how the contents or ownership appear or are described by people at the

scene of the search.

95.     The computer personnel searching this data may examine all of the data contained in the

computer equipment and storage devices to view their precise contents and determine whether

the data falls within the items to be seized as set forth herein. In addition, the computer

personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to

determine whether the data falls within the list of items to be seized as set forth herein.

96.     Based on discussions with other law enforcement agents, I have discovered that private

citizens and businesses are using electronic service providers who provide the service of storing

34

data from anywhere there is service to the Internet, commonly known at the "cloud" based

storage. This allows the customer to connect to the server and view, alter, create, copy, and print

the data from the remote server as if it were at the same location as the user. The user typically

owns and controls the data stored at the remote server while the electronic service provider owns

the server on which the data is stored.

97.     Law enforcement typically does not find out about the existence of the remote server

until the service of the initial search warrant takes place. Law enforcement cannot access or

view this cloud based data unless they know it exists and have access to a remote computer

capable of connecting and authenticating to the user's cloud-based account. Witnesses and other

informants who have access to the data typically to not know where the data is stored either.

98.     The server may be located in another city or state from the site of the initial service,

making it difficult for law enforcement to preserve the evidence in a traditional manner. It takes

hours and sometimes days to determine the location of the remote server and gather the details

containing the specificity necessary for the issuance of a second search warrant. Depending on

the size of the evidence, a suspect can delete it from a system within seconds using a smart

phone or another Internet capable device away from the search warrant location. A qualified

computer specialist often can recover evidence suggesting whether a computer (including a

computer, cell phone or other Internet capable device) was used to access data which had been

stored on a remote server in a cloud storage account. Such information is often maintained

indefinitely until overwritten by other data.

### INCREMENTAL SEARCH PROCECURES

99.     I do not know, and cannot determine through public records searches or other proper

investigative techniques, which computer or computers at the doctors' offices were involved in

the unauthorized knowing and intentional distribution or dispensation of controlled substances. Accordingly, multiple computers, to include tablets and lap tops, at the office may be subject to search and seizure pursuant to this warrant. First, the agents on the scene, as well as an Assistant United States Attorney assigned to the case who will be available by telephone, will seek the cooperation of appropriate personnel at the Ailment Wellness Medical Center. If possible, and if cooperation is forthcoming, investigators will attempt to identify which computer(s) at that location may have been involved with the criminal activity described in this Affidavit. At both the Ailment and Wellness Medical Center and The Pain Center, office personnel present at the time the search warrant is executed will NOT be permitted to perform any additional work on their computers or to log-off their terminal or to exit from the document on which they are working.

100. Second, with or without cooperation of persons in the offices, agents who are trained in searching and seizing computer date will attempt to narrow the number of computers and electronic media that are subject to possible seizure and analysis.

101. Third, search agents will first attempt to image computers and electronic media to minimize the number of computers that are seized and removed from the business. In addition, agents will attempt to copy paper files on scene. Should on-site imaging and/or copying not be practical, the paper files, computers and electronic media will be removed and the copying and imaging will be completed off-site. The search agents will return the computers and electronic media within five business days following the execution of the search warrant.

102. Your Affiant also recognizes that removal of paper patient and other files (described in Attachment B) may have the unintended and undesired effect of limiting the business's ability to provide service to legitimate patients. Accordingly, the search agents will request a schedule of

36

patients that Ailment Wellness Medical Center and the Pain Center have scheduled for the week

following the date of execution of the search warrant. Duplicate copies of the patient files for the

following week will be returned to the businesses the next business day. Duplicatre copies of

additional patient files will be returned on a rolling basis to the businesses.

## CONCLUSION

103.    Based on the forgoing, I respectfully submit that there is probable cause to believe the

Target Premises contains evidence of a crime; contraband, fruits of crime, or other items illegally

possessed; and property designed for use, intended for use, or used in committing violations of

federal law, specifically the distribution or dispensing of controlled substances, in violation of 21

U.S.C. § 841 (a)(1) and possession of a controlled substance, in violation of 21 U.S.C. § 844 (a).


Respectfully submitted,

Ashley Symons
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me
on May 3, 2018

/S/

David J. Novak
United States Magistrate Judge


UNITED STATES MAGISTRATE JUDGE


37

**ATTACHMENT A-1**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

The premise to be searched is Ailment Wellness Medical Center, 2216 Princess Anne St. Suite 102, Fredericksburg, Virginia, 22401.

The location is described as multi-unit medical office building that bears the numbers 2216 in white above the main entrance. The main entrance to the office building is located on the north side of the building, accessed through two glass doors that are operated by an electronic motion sensor. The Ailment Wellness Medical Center is located on the first floor of the medical building. The entrance door for the Ailment Wellness Medical Center is an inward opening single glass door. Adjacent to the door and affixed to the wall near the door is a gray placard indicating Suite 102 in black block print.



**ATTACHMENT B-1**

**ITEMS TO BE SEIZED**

For the period of January 1, 2014, until present, with regard to Ailment Wellness Medical Center,

## Items to be Seized

1.      All records and information relating to violations of 21 U.S.C. §§ 841(a)(1), 843, and 846, and 18 U.S.C. §§ 1956 and 1957, including those that show:

a.      For the time period January 1, 2014, to November 1, 2017:  Any and all documents that refer or relate to the price, quantity and/or times when controlled substances, including alprazolam, oxycodone, and hydrocodone, were requested, prescribed, obtained, transferred, sold, or purchased, including but not limited to invoices from pharmaceutical companies, ledgers, customer lists, appointment books, pharmacy information, correspondence, notations, logs, receipts, journals, books, and records.

b.      For the time period January 1, 2014,  to November 1, 2017: Any and all medical records, patient files, sign-in sheets, charts, billing information, payment records, dispensation records and identification documents that refer to any patients who were prescribed or dispensed controlled substances.

c.      For the time period January 1, 2014, to November 1, 2017:  Any and all personal telephone and address books and listings, letters, cables, telegrams, emails, personal notes, and other items that refer or relate to the prescription, transfer, purchase, or sale of controlled substances.

d.      For the time period January 1, 2014, to November 1, 2017:  Any and all financial records showing payment, receipt, concealment, transfer, or movement of money relating to the prescription, transfer, purchase, sale or concealment of controlled substances.

e.      For the time period January 1, 2014, to November 1, 2017: Documents, including, but not limited to emails, check registers, cancelled checks, deposit items, bank/investment statements, financial instruments, facsimile transmissions, or ledgers that refer to any person who was prescribed, provided with, or sold controlled substances.

f.      For the time period January 1, 2014, to November 1, 2017: Memoranda concerning, correspondence with and/or letters to or from any insurance company that refer to any person who was prescribed, provided with, or sold controlled substances.

g.      As used above, the terms oxycodone and hydrocodone include all medications containing the drug including those marketed under brand names, e.g., Roxicodone®, OxyContin®, Vicodin®, Norco® and Loratab®.

h.      With respect to any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period January 1, 2014, to November 1, 2017.

i.      All computer hardware used to commit, further, or facilitate any violation of the offenses cited above, including any and all electronic storage devices or electronic equipment capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.  Included within the definition of computer hardware is any data processing hardware (such as central processing units and self-contained laptop or notebook computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical and compact disk storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone generating devices); and any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

j.      For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying the individual(s) who owned, used, possessed, accessed, or controlled the hardware device at the time the events described in the affidavit above, including but not limited to any logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail contacts, communications and correspondence (including but not limited to e-mail, chat, and instant messaging), and photographs.  For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying any electronic storage device or equipment that was attached or connected by any means or manner to the hardware device.

k.      All computer software used to commit, further, or facilitate any violation of the offenses cited above, including any and all information, instructions,

programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components. Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

        l.     All computer software designed, intended, or that can be used to delete, eliminate, encrypt, hide, or obscure any records on any computer hardware device or equipment. All computer-related documentation, meaning any written, recorded, printed, or electronically-stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items;

        m.     All passwords and data security devices, meaning any devices, programs, or data -- whether themselves in the nature of hardware or software -- that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records. Such items include, but are not limited to, data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

        n.     The term record, as used above, means any document, information, data, or material, including that used to facilitate interstate communications, in whatever form and by whatever means such document, information, data, or material, its drafts or modifications, may have been created or stored, including, but not limited to, any hand-made form (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, video tapes, motion pictures or photocopies); any mechanical form (such as photographic records, printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact disks); or any data or information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical disks, printer buffers, sort cards, memory calculators, electronic dialers, or electronic notebooks), as well as printouts or readouts from any magnetic storage device, including any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding.